IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
January 13, 2026 Session

**STATE OF TENNESSEE v. GEORGE HARRIS PATTERSON, III**

**Appeal from the Criminal Court for Davidson County**
**No. 2023-C-1722    Steve R. Dozier, Judge**

———————————————————

**No. M2024-01608-CCA-R3-CD**

———————————————————

Defendant, George Harris Patterson, III, who was described at oral argument as a First Amendment Auditor, was indicted for resisting arrest, disorderly conduct, and assault on a first responder after an incident at a Davidson County Post Office. A jury found Defendant not guilty of resisting arrest but guilty of disorderly conduct and assault. Defendant appeals, raising several issues. He challenges the sufficiency of the evidence, the constitutionality of the disorderly conduct statute under the First Amendment as applied to him, the trial court's failure to give a special jury instruction, the trial court's admission of a piece of evidence and testimony from a postal employee, and the trial court's failure to grant a mistrial. He also insists he is entitled to cumulative error relief. After a review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

TIMOTHY L. EASTER, J., delivered the opinion of the court, in which ROBERT L. HOLLOWAY, JR., and JILL BARTEE AYERS, JJ., joined.

Ellison M. Berryhill (on appeal); Kaylee Ann Kohlmaier and Jonathan F. Wing (at trial), Assistant Public Defenders, Nashville, Tennessee, for the appellant, George Harris Patterson, III.

Jonathan Skrmetti, Attorney General and Reporter; Benjamin A. Ball, Senior Assistant Attorney General; Glenn R. Funk, District Attorney General; and Derick Blakely, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

Defendant was indicted by the Davidson County Grand Jury for assaulting a first responder, resisting arrest, and disorderly conduct, for events that took place on April 2,

2022, at the Dickerson Road post office. These events were video recorded by both Defendant and the first responder involved.

At trial, the jury heard the testimony of Joe Earl Whitlow, III, an employee of the United States Post Office Northeast location in Nashville on Dickerson Road. Mr. Whitlow was working on April 2, 2022, at 10:30 a.m. when Defendant came "into the office with a camera in his hand . . . recording." Defendant was wearing a shirt with "rainbow bears," a "rainbow mask," and a jacket. Mr. Whitlow asked Defendant if he needed "help." Defendant said no but "kept recording and putting the camera up in [Mr. Whitlow's] face and . . . just walking around" the post office. Mr. Whitlow asked Defendant if he needed help a second time, and Defendant again said no. Mr. Whitlow told Defendant he did not "consent to be on camera" and that Defendant needed to "get out." Mr. Whitlow described Defendant as "very aggressive" and commented it was obvious that Defendant "didn't want to leave."

Defendant told Mr. Whitlow he was "videotaping" the post office as an "independent journalist." Defendant continued recording with his phone, walking to the side of the counter to take footage of the work area behind the counter. At this point, Mr. Whitlow took out his own phone and started to record Defendant. Defendant asked Mr. Whitlow to stop recording and said that he did not consent to the recording. Mr. Whitlow again asked Defendant to leave the post office. Defendant asked Mr. Whitlow where "article seven or postal 7"[1] was located. Mr. Whitlow, "unaware" about what Defendant was asking, again asked Defendant to leave. Mr. Whitlow was the only employee at the counter, and he was "trying to help another lady" mail a package containing "cremations of her daughter[,]" but he "saw later" that the "lady" may have been there with Defendant.

At one point, Mr. Whitlow "went around" the counter to try to "get [Defendant] and the lady" out of the post office. Mr. Whitlow asked Defendant to leave because he was disrupting business. Mr. Whitlow explained Defendant "continued to just cause a disturbance inside." Postal employees "couldn't get [Defendant] out" of the post office after asking him to leave "[m]ultiple times." Defendant placed the camera "close" to Mr. Whitlow's face. Mr. Whitlow described the interaction as "disturbing" and stated that he could not "conduct business anymore because [Defendant] was there and interrupting everybody else who wanted to come in and be able to do anything."

---

[1] Defendant appeared to be referring to a poster entitled "Rules and Regulations Governing Conduct on Postal Service Property." The poster was entered as an exhibit at trial. The poster, among other things, indicates that depositing or posting handbills or other literature is prohibited; that photographs for "news purposes" may be taken in entrances, lobbies, foyers, corridors, or auditoriums except where prohibited by authorized personnel; and that conduct which impedes entrance to the post office, is disorderly, or creates a loud or unusual noise is prohibited.

Defendant walked out into the entrance area, filming the post office boxes and signs. Defendant exclaimed that "Homeland Security Post number seven" was not on display. Defendant returned to the counter, where a customer told Defendant she was conducting business. Defendant told the customer that Poster Seven was not on display. Defendant continued to record. Mr. Whitlow's supervisor, Kimberly, came out from the rear area of the post office and asked Defendant if he needed assistance.[2] Defendant informed the supervisor that he was looking for Poster Seven. The supervisor did not know what Defendant was talking about and asked Defendant to leave. Defendant informed the supervisor that the poster gave him the authority to film. The supervisor again asked Defendant to leave and told him that she would inquire about the poster and have it on display when he returned.

Mr. Whitlow's supervisor eventually "locked the door" to the customer service area. Defendant continued to film from the "boxed section" of the post office, where the "PO boxes" were located. The entire episode lasted "20 to 30 minutes, maybe more" before the police were called. Mr. Whitlow explained that Defendant continued to "antagonize and mess with" both him and his supervisor to try to "get a reaction out of" them. Defendant even tried to "put his phone through the back" through an open door to the employee area to continue filming.

When a police officer arrived, Mr. Whitlow could see and hear the interaction between the officer and Defendant. The officer asked Defendant to leave. Mr. Whitlow identified the video from Defendant's phone. He saw the video on YouTube but did not upload it himself or give anyone permission to upload the video. Mr. Whitlow also identified several videos showing Defendant at the post office that Mr. Whitlow took using his phone. Mr. Whitlow identified "Poster [Seven]," the poster about which Defendant inquired when he entered the post office. The poster was not hanging in the post office at the time Defendant came to the post office, but Mr. Whitlow later saw the poster. He explained the poster has a section labeled "disturbances" which reads as follows:

> Disorderly conduct, or conduct that creates loud or unusual noise, or which impedes entrance to or departure from Post Offices or otherwise obstructs the usual use of entrance foyers, corridors, offices, elevators, stairways and parking lots or which otherwise tends to impede or disturb the public or employees in the performance of their duties, or which otherwise impedes or disturbs the general public in transacting business or obtaining services provided on Postal Service property is prohibited.

The poster also contained a section on photography, stating:

---

[2] The last name of Mr. Whitlow's supervisor is not contained in the record.

Photographs for news purposes may be taken in entrances, lobbies, foyers, corridors or auditoriums when used for public meetings except where prohibited by official signs or Security Force personnel, or other authorized personnel or federal court order or rule. Other photographs may be taken only with the permission of the local Postmaster or installation head.

On cross-examination, Mr. Whitlow admitted that he did not know the video was posted on YouTube until about one week prior to the trial. When asked if he had any interaction with Defendant after April 2, 2022, Mr. Whitlow replied that Defendant "came back a couple of weeks later." Counsel for Defendant objected "[p]otentially" on "404" grounds. Counsel for Defendant moved for a mistrial. The trial court denied the motion.

Officer Ryan Papp was on duty as an officer for the Metro Nashville Police Department on April 2, 2022. He was assigned to the East Precinct and responded to a call at the Dickerson Road post office at around 10:00 a.m. When he walked in the front door, he saw Defendant "standing there as well a[s] another female." The door to the separate section of the post office where customer service took place and where the postal clerks were stationed was locked. Defendant told Officer Papp that the postal employees locked him out and refused him service, but Defendant admitted that the employees asked him to leave and he refused to leave because he said he did not "have to" leave. Defendant told the officer he was on "public property" and that he had not committed a crime, so he did not have to leave.

Officer Papp saw a "wooden door," one of those "split doors that patrons can use to speak with staff." The split door was open to the lobby area of the post office. Officer Papp moved to the door to "speak with one of the workers, [Mr. Whitlow's supervisor], that told [him] that the individual in question, [Defendant], . . . was asking for a form that they do not have." The supervisor explained to Officer Papp that she told Defendant they did not have the form and "had asked him to leave a number of times and he refused to leave."

After talking to the supervisor, Officer Papp "approached" Defendant, and "explained to him that he would have to leave." Defendant refused. Officer Papp could not determine Defendant's purpose for being at the post office. He approached Defendant and tried to get him to leave so that the post office could unlock the door to the customer service area and conduct business normally.

A customer entered the post office and could not get through the locked door. Defendant offered to move to the back corner of the lobby area so that the employees would open the door. Rather than opening the locked door, a postal employee came to the wooden

- 4 -

door to see what the customer needed. Defendant moved toward the "wooden door and started filming inside of that [restricted] access area." A postal employee closed the wooden door.

Defendant stated, "that's how you get privacy." Officer Papp felt the situation was "escalating", so he "approached" Defendant and "[t]ouched him on his right arm to get his attention." Officer Papp testified he "tried to guide [Defendant] toward the front door to move him outside." According to Officer Papp, Defendant "spun, moved [Officer Papp's] arm off of him and took a few steps back and said don't touch me."

Officer Papp moved closer toward Defendant, "pointed toward the door and said go." Defendant told the officer, "No." Officer Papp tried to "touch [Defendant's] right arm and try to guide him outside[,]" but Defendant "pushed" Officer Papp's hand away. Officer Papp "moved behind him, wrapped him in a bear hug, took the weight off of his feet to gain control of him and [] moved him outside." Officer Papp felt like the "safest option for both the staff there" and "for [Defendant]" was to "move [Defendant] outside." Defendant was compliant as soon as Officer Papp "wrapped him in the bear hug." The officer's body cam video was introduced as an exhibit.

Officer Papp explained that he had participated in use of force training, and he felt like he used his training and expertise appropriately to handle the situation. Officer Goran Manojlovic responded to the call for back up. Defendant was in handcuffs when Officer Manojlovic arrived.

Defendant did not testify or present any evidence.

The jury found Defendant guilty of assaulting a first responder and disorderly conduct. The jury acquitted Defendant of resisting arrest.

At a July 30, 2024 hearing, Defendant was sentenced to eleven months and twenty-nine days suspended after forty-five days with no program and/or behavior credits, with the balance to be served on supervised probation on the assault on a first responder conviction. He was sentenced to thirty days on supervised probation for disorderly conduct, to be served concurrently with the sentence on the assault conviction. The sentences were stayed pending appeal.

Defendant appeals, arguing that: (1) the evidence is insufficient to sustain his convictions for assault and disorderly conduct; (2) the trial court erred by failing to dismiss the disorderly conduct charge for violating the First Amendment; (3) the trial court erred when it failed to grant Defendant's request for a special jury instruction containing additional examples of extremely provocative conduct; (4) the trial court erred when it

allowed the State to introduce a "non-statutory" definition of disorderly conduct through Poster Seven; (5) the trial court erred by failing to grant a mistrial when Mr. Whitlow testified to actions of Defendant in violation of the trial court's 404(b) order; (6) the trial court erred by allowing the State to present evidence that Defendant posted the video online; and (7) cumulative error mandates a new trial. We will address each issue in turn.

*Analysis*

*Sufficiency of the Evidence*

First, Defendant complains that the evidence is insufficient to sustain his convictions. Defendant argues that the evidence does not support his conviction for assault on a first responder because his conduct was not "extremely offensive or provocative" because "officers are supposed to be at a higher level of restraint than an average citizen." Moreover, he argues that he should not have been found guilty of disorderly conduct because he did not have "the intent to cause public annoyance or alarm" or create "a hazardous or physical offensive condition" and the proof did not show that his acts served "no legitimate purpose." The State disagrees.

"Because a verdict of guilt removes the presumption of innocence and raises a presumption of guilt, the criminal defendant bears the burden on appeal of showing that the evidence was legally insufficient to sustain a guilty verdict." *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009) (citing *State v. Evans*, 838 S.W.2d 185, 191 (Tenn. 1992)). When a defendant challenges the sufficiency of the evidence, the standard of review applied by this Court is "whether '*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *State v. Parker*, 350 S.W.3d 883, 903 (Tenn. 2011) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original)). When this Court evaluates the sufficiency of the evidence on appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable inferences that may be drawn from that evidence. *State v. Davis*, 354 S.W.3d 718, 729 (Tenn. 2011) (citing *State v. Majors*, 318 S.W.3d 850, 857 (Tenn. 2010)).

Guilt may be found beyond a reasonable doubt where there is direct evidence, circumstantial evidence, or a combination of the two. *State v. Sutton*, 166 S.W.3d 686, 691 (Tenn. 2005); *State v. Hall*, 976 S.W.2d 121, 140 (Tenn. 1998). The standard of review for sufficiency of the evidence "'is the same whether the conviction is based upon direct or circumstantial evidence.'" *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *Hanson*, 279 S.W.3d at 275). Circumstantial evidence alone may be sufficient to sustain a conviction. *State v. Sisk*, 343 S.W.3d 60, 65 (Tenn. 2011). The jury as the trier of fact must evaluate the credibility of the witnesses, determine the weight given to witnesses' testimony, and reconcile all conflicts in the evidence. *State v. Campbell*, 245

S.W.3d 331, 335 (Tenn. 2008) (citing *Byrge v. State*, 575 S.W.2d 292, 295 (Tenn. Crim. App. 1978)). When considering the sufficiency of the evidence, this Court shall not substitute its inferences for those drawn by the trier of fact. *Id*.

### A. Assault on a First Responder

To sustain a conviction for assault on a first responder, the State had to prove that Defendant "knowingly cause[d] physical contact with a law enforcement officer, . . . , and a reasonable person would regard the contact as extremely offensive or provocative, including, but not limited to, spitting, throwing, or otherwise transferring bodily fluids, bodily pathogens, or human waste onto the person of a . . . first responder" when the first responder was "discharging or attempting to discharge" their official duties. T.C.A. § 39-13-116(a)(2).

At the outset of the analysis, we find it important to note that Defendant was convicted of assault against a law enforcement officer, first responder, or nurse, a violation of Tennessee Code Annotated section 39-13-116(a)(2). This statute became effective in 2020. This statute, as quoted above includes examples of physical conduct that could be construed as "extremely offensive or provocative." We were unable to find any case from this Court or the Tennessee Supreme Court reviewing the sufficiency of the evidence for a conviction for assault under Tennessee Code Annotated section 39-13-116(a)(2). In fact, the cases cited by Defendant to support his argument that the evidence was insufficient involve convictions under Tennessee Code Annotated section 39-13-101(a)(3), the generic misdemeanor assault statute, not Tennessee Code Annotated section 39-13-116, defining assault or aggravated assault against a law enforcement officer, first responder, or nurse.

While both statutes require contact that a reasonable person would regard as extremely offensive or provocative, the conduct for a violation of Tennessee Code Annotated section 39-13-101(a)(3) requires an intentional or knowing physical contact. Assault against a law enforcement officer, first responder, or nurse (Tennessee Code Annotated section 39-13-116) requires only a knowing physical contact. Nevertheless, we find the analysis helpful here as both statutes use the "extremely offensive or provocative" language, terms not defined in the Code.

While analyzing whether assault by extremely offensive or provocative contact under Tennessee Code Annotated section 39-13-101(a)(3) was a lesser-included offense of aggravated assault, our supreme court in *State v. Smiley*, turned to the law of torts to define contact that is extremely offensive or provocative. 38 S.W.3d 521, 525 (Tenn. 2001) (citing Stuart M. Speiser et al., *The American Law of Torts*, §26:15). *Smiley* generally defines such contact as that which "offends a reasonable sense of personal dignity." *Id*. It is contact that is lesser than that which causes bodily injury, liken to "physical contact such

as kissing without one's consent, cutting one's hair without consent, or spitting in one's face." *Id.*

Defendat cites several other cases where convictions for assault (under Tennessee Code Annotated section 39-13-101(a)(3)) were upheld and argues that the "level of contact" in his case does not rise to the level of contact in the cases where the convictions were upheld. *See e.g.*, *State v. Meeks*, No. W2022-01327-CCA-R3-CD, 2023 WL 6013093, at *4 (Tenn. Crim. App. Sept. 15, 2023) (finding extremely offensive or provocative contact where the defendant brandished a knife, got in the victim's face, yelled and cursed at her, and poked her in the head), *no perm. app. filed*; *State v. Barrom*, No. W2005-01596-CCA-R3-CD, 2006 WL 2091387, at *8 (Tenn. Crim. App. July 28, 2006) (upholding conviction for assault based on extremely offense or provocative contact when someone "cursed and threatened to kill the victim, pushed the victim, and kicked him four times"), *perm. app. denied* (Tenn. Dec. 18, 2006).

In addition, we note that in *State v. Every*, No. E2024-00842-CCA-R3-CD, 2025 WL 2390640, at *7 (Tenn. Crim. App. Aug. 18, 2025), *no perm. app. filed*, this Court upheld a conviction for assault based on extremely offensive or provocative conduct where the defendant "shoved" a person "into the host stand with both hands" when the person invaded her personal space and touched her with his stomach. A panel of this Court pointed out that "the offensive and provocative nature of the listed contacts in *Smiley* stems from the nonconsensual nature of the contact coupled with the form of contact," concluding that an "uninvited, two-hand shove" was "contact that a reasonable person" would find extremely offensive or provocative. *Id.* In yet another case, *State v. Tidwell*, No. 01C01-9610-CR-00445, 1998 WL 92115, at *4 (Tenn. Crim. App. Mar. 4, 1998), *perm. app. denied* (Tenn. Nov. 2, 1998), this Court upheld a conviction for assault under Tennessee Code Annotated section 39-13-101(a)(3) where the defendant "actively pushed" a police officer to try to gain access to her dog. The panel noted that what behavior is classified as extremely offensive or provocative is "an objective standard measured by what a reasonable person would think if he or she were pushed backwards." *Id.*

Our search finds no direct appeal to an appellate court in Tennessee, raising a sufficiency of evidence challenge to what constitutes "extremely offensive or provocative" contact, has been successful. And such an effort makes sense because, as pointed out by *Tidwell*, this is an objective standard measured by what a reasonable person would think if he or she were subjected to such contact. *Id*. Once there is evidence of contact between humans, the determination of that contact being extremely offensive or provocative, rest with the finder of fact alone. We, as a reviewing court, cannot re-weight or re-evaluate this determination with our own substituted opinions. *See State v. Mitchell*, 592 S.W.3d 431,436 (2019).

Defendant suggests that "officers are supposed to be at a higher level of restraint than an average citizen," to support his argument that his conduct was not "extremely offensive or provocative."  We disagree with Defendant's argument that the standard for offensive or provocative physical conduct is higher when the victim is a law enforcement officer.  Defendant cites *Garvey v. State*, 537 S.W.2d 709, 711 (Tenn. Crim. App. 1975), for the proposition that law enforcement officers are held to a different standard.  *Garvey* limited its discussion to the issue of what constituted "fighting words" during an interaction with an officer rather than addressing physical conduct.  *Id.*  The defendant in *Garvey* was convicted of disorderly conduct, not assault.  Moreover, *Garvey* did not create any type of blanket rule that permits individuals to treat officers differently.  *Id.*  The statute simply does not carve out any type of exception allowing individuals to treat officers differently.  Both assault under 39-13-101(a)(3) and assault under 39-13-116(a)(2) require "physical contact" that a "reasonable person would regard" as "extremely offensive or provocative."  The examples in Tennessee Code Annotated section 39-13-116(a)(2) are just that – examples.  The statute itself says the physical contact is "including, *but not limited to*" meaning that there are other types of physical contact that can satisfy the requirements of the statute.  In our view, Defendant's contact here, pushing Officer Papp's hand away while he was trying to diffuse the situation at the post office by leading Defendant outside, was something that a rational jury could find beyond a reasonable doubt a reasonable person would find extremely offensive or provocative.  Accordingly, the evidence is sufficient to support the assault conviction and Defendant is not entitled to relief on this issue.

### B.  Disorderly Conduct

To sustain a conviction for disorderly conduct, the State was required to prove that Defendant was in a public place "with intent to cause public annoyance or alarm" and created a "hazardous or physically offensive condition by an act that serves no legitimate purpose."  T.C.A. § 39-17-305(a)(3).

While hazardous is not defined in the statute, this Court has noted that hazardous is generally defined as "risky" or "dangerous."  *State v. Webber*, No. M2014-02527-CCA-R3-CD, 2015 WL 6774014, at *4 (Tenn. Crim. App. Nov. 6, 2015) (citing *Black's Law Dictionary* (10th ed. 2014)), *perm app. denied* (Tenn. Mar. 30, 2016).  "Physically offensive condition" is also not defined in the code.  Black's Law Dictionary defines offensive as "unpleasant or disagreeable to the senses; obnoxious" or "causing displeasure, anger, or resentment; esp., repugnant to the prevailing sense of what is decent or moral."  *Black's Law Dictionary* (12th ed. 2024).

Defendant argues that the facts in his case "do not approach the severity of the facts in the cases" he cites.  Defendant insists that he merely "walked into a public place and recorded it on his phone" and did "nothing to impede anyone doing business" and that "any

slowing down of business was caused by the employee's overreaction." Defendant claims that there was nothing "hazardous or physically offensive" about his behavior and that the State failed to show he "had the intent to cause public annoyance or alarm" and cannot prove that his act served no legitimate purpose. The State disagrees, insisting that the evidence is sufficient to support a conviction for disorderly conduct. We agree with the State. The proof at trial established that Defendant was in the post office, a public place, where he continued to film with his phone after being asked multiple times by postal employees to stop. Defendant impeded not only the employees of the post office from doing their jobs, but impeded members of the public from accessing the post office when employees had to lock the doors of the customer service area after Defendant argued with employees and filmed customers who were attempting to conduct business after being asked repeatedly to stop. There was ample evidence from which the jury could have determined Defendant was in a public place with the intent of causing public annoyance or alarm and created a physically offensive condition. Moreover, the jury could have easily determined that Defendant's actions served no legitimate purpose. Defendant argues that his actions were driven by the First Amendment, but we find this argument unavailing, at least with regard to the sufficiency of the evidence to support the conviction for disorderly conduct. Defendant is not entitled to relief on this issue.

*First Amendment Violation*

Next, Defendant argues that Tennessee Code Annotated section 39-17-305(a)(3) violates the First Amendment as applied to his situation. Specifically, he claims that "the First Amendment protects his rights to be in the post office, film, and talk in the way he did to the post office employees" and "[b]ecause that behavior is protected, it cannot be criminalized." In other words, he insists that the State cannot prove he is guilty of disorderly conduct without using "evidence of the protected actions." The State disagrees.

Defendant filed a pretrial motion to dismiss the indictment because it violated the First Amendment. The trial court denied the motion. Defendant raised the issue again in a motion for judgment of acquittal. The trial court denied the motion a second time. Defendant raised the issue again in a renewed motion for judgment of acquittal after sentencing and in his motion for new trial. The trial court denied the motions. Because Defendant properly raised the issue in the trial court, we will review the issue on appeal.

We review issues of constitutional law de novo, without affording the trial court's legal conclusions any presumption of correctness. *See, e.g., Fisher v. Hargett*, 604 S.W.3d 381, 395 (Tenn. 2020); *Bredesen v. Tenn. Jud. Selection Comm'n*, 214 S.W.3d 419, 424 (Tenn. 2007); *Gallaher v. Elam*, 104 S.W.3d 455, 460 (Tenn. 2003). "When reviewing the constitutionality of a statute, we begin "with the presumption that an act of the General Assembly is constitutional" and "must indulge every presumption and resolve every doubt

- 10 -

in favor of constitutionality." *Riggs v. Burson*, 941 S.W.2d 44, 51 (Tenn. 1997). "In contrast to a facial challenge, which involves the constitutionality of the statute as written, an as applied challenge to the constitutionality of a statute is evaluated considering how it operates in practice against the particular litigant and under the facts of the instant case, not hypothetical facts in other situations." *State v. Crank*, 468 S.W.3d 15, 24 n.5 (Tenn. 2015) (quoting *City of Memphis v. Hargett*, 414 S.W.3d 88, 107 (Tenn. 2013)) (internal quotations omitted).

The First Amendment to the United States Constitution provides, in relevant part, that "[c]ongress shall make no law. . . abridging the freedom of speech." U.S. Const. amend. I. The First Amendment applies to the states through the Fourteenth Amendment. *Bigelow v. Virginia*, 421 U.S. 809, 811 (1975). Similarly, Article I, section 19 of the Tennessee Constitution states in relevant part that "[t]he free communication of thoughts and opinions is one of the invaluable rights of man, and every citizen may freely speak, write, and print on any subject, being responsible for the abuse of that liberty." Article I, section 19 provides protection of free speech rights at least as broad as the First Amendment. *Leech v. Am. Booksellers Ass'n, Inc.*, 582 S.W.2d 738, 745 (Tenn. 1979).

Analysis of a free-speech claim must proceed in three steps. *Cornelius v. NAACP Legal Defense and Educ'al. Fund, Inc.*, 473 U.S. 788, 797 (1985). First, we must determine if there is speech protected by the First Amendment. Second, we need to determine whether the forum is public or nonpublic in order to determine the proper standard. Third, we must apply the appropriate standard. *Id.*

Defendant correctly notes that there are no Tennessee cases that have definitively ruled on whether an individual's right to record government employees is protected by the First Amendment. Defendant instead cites cases from six federal circuits recognizing a person's right to record, mostly dealing with police activity. *See e.g. Askins v. Dep't of Homeland Sec.*, 899 F.3d 1035, 1044 (9th Cir. 2018) ("The First Amendment protects the right to photograph and record matters of public interest."); *Fields v. City of Philadelphia*, 862 F.3d 353, 356 (3d Cir. 2017) ("[R]ecording police activity in public falls squarely within the First Amendment right of access to information. As no doubt the press has this right, so does the public."); *Turner v. Lieutenant Driver*, 848 F.3d 678, 689 (5th Cir. 2017) ("[W]e conclude that First Amendment principles, controlling authority and persuasive precedent demonstrate that a First Amendment right to record the police does exist, subject only to reasonable time, place, and manner restrictions."); *Am. C.L. Union of Ill. V. Alvarez*, 679 F.3d 583, 600 (7th Cir. 2012) (The act of making an audio or audiovisual recording is necessarily included within the First Amendment's guarantee of speech and press rights as a corollary of the right to disseminate the resulting recording."); *Gilk v. Cunniffe*, 655 F.3d 78, 87 (1st Cir. 2011) ("Gathering information about government officials in a form that can readily be disseminated to others serves a cardinal First Amendment interest in

- 11 -

protecting and promoting 'the free discussion of governmental affairs.'") (quoting *Mills v. State of Ala.*, 384 U.S. 214, 218 (1966)); *Smith v. City of Cumming*, 212 F.3d 1332 (11th Cir. 2000) ("The First Amendment protects the right to gather information about what public officials do on public property, and specifically, a right to record matters of public interest."). We see no reason to depart from the analyses of these cases and find that Defendant's act of recording in the post office is protected speech under the First Amendment.

Next, we need to determine whether the forum is public or nonpublic in order to determine the proper standard. Defendant's claim that the application of the disorderly conduct statute to him under the circumstances of this case violated his First Amendment rights to speak and to record depends largely on the classification of the post office. The Supreme Court relies on a forum-based approach to analyze activity on publicly owned property and "recognize[s] three types of government-controlled spaces: traditional public forums, designated public forums, and nonpublic forums." *Minn. Voters Alliance v. Mansky*, 585 U.S. 1, 11. While the government may restrict speech in the first two types of forums only by imposing "reasonable time, place, and manner restrictions," the government may reserve the latter "nonpublic forum" "for its intended purposes, communicative or otherwise, as long as the regulation on speech is reasonable and not an effort to suppress expression merely because public officials oppose the speaker's view." *Id.* (citation omitted). The three categories exist along a "spectrum extending from those deserving the greatest constitutional protection to those deserving the least" with the traditional public forum on the end of the spectrum receiving the greatest constitutional protection and the nonpublic forum receiving the least. *Tyler v. City of Kingston*, 74 F.4th 57, 62 (2d Cir. 2023).

The traditional public forum usually includes places like streets and parks that "have immemorially been held in trust for the use of the public, and, time out of mind, have been used for purposes of assembly, communicating thought between citizens, and discussing public questions." *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 45 (1983) (quoting *Hague v. Comm. for Indus. Org.*, 307 U.S. 496, 515 (1939)). The government can enforce "time, place, and manner of expression" regulations only if they are content neutral and "narrowly tailored to serve a significant government interest, and leave open ample alternative channels of communication." *Id.*

The designated public forum, on the other hand, is public property that the government opens "for use by the public as a place for expressive activity." *Id.* The government does not have to keep a property open as a designated public forum in perpetuity, but as long as a property is open as a designated public forum, the government is bound by the same standards as the traditional public forum. *Perry Educ. Ass'n*, 460 U.S. at 45-46.

Finally, the last category is the nonpublic forum. The "First Amendment does not guarantee access" to government property "simply because it is owned or controlled by the government." *U.S. Postal Serv. v. Council of Greenburgh Civic Assoc.*, 453 U.S. 114, 130 n.6 (1981). A "property is not transformed into 'public forum' property merely because the public is permitted to freely enter and leave the grounds at practically all times and the public is admitted to the building during specified hours." *United States v. Grace*, 461 U.S. 171, 178 (1983) (citing *Greer v. Spock*, 424 U.S. 828, 836 (1976)). While the government may restrict speech in the public forums, designated public forums, and limited public forums only by imposing "reasonable time, place, and manner restrictions," the government has the authority to restrict speech in a nonpublic forum "for its intended purposes, communicative or otherwise, as long as the regulation on speech is reasonable and not an effort to suppress expression merely because public officials oppose the speaker's view." *Minn. Voters All. v. Mansky*, 585 U.S. 1, 11-12 (citation omitted).

Here, Defendant insists that the post office is a traditional public forum. Rather than citing authority to support his position, Defendant merely states "[t]his Court should determine that the post office is a . . . public forum." He opines that because the purpose of the post office is to "share information" it follows that the post office is a public forum and therefore, the governmental regulations on free speech must be content neutral, narrowly tailored to serve a significant governmental interest, and leave open ample alternative channels for communication of the information. *Ward v. Rock Against Racism*, 491 U.S. 781, 790-91 (1989). In this part of his argument, Defendant seems to switch gears, classifying the words he used while at the post office, rather than the act of filming, as the "speech" that was prohibited. He acknowledges that his words could be prohibited if they were "fighting words," which are not protected speech. *See Chaplinsky v. New Hampshire*, 315 U.S. 568 (1942). The State acknowledges that no Tennessee court has considered whether a post office is a public or nonpublic forum, but notes that federal courts have answered this question, consistently holding that post offices are nonpublic forums. *See, e.g. Wozar v. Campbell*, 763 F. Supp. 3d 179, 202 (D. Conn. 2025) (finding post office to be nonpublic forum when plaintiff was barred from video recording); *Watkins v. U.S. Postal Employee*, 611 Fed. Appx. 549, 552 (11th Cir. 2015) (finding limitation on singing in a post office lobby to be a reasonable restriction on expression) (quoting *Cornelius*, 473 U.S. at 800); *Moore v. U.S. Postal Serv.*, 159 Fed. Appx. 265, 267 (2d Cir. 2005) (finding a post office to be a nonpublic forum); *Longo v. U.S. Postal Serv.*, 983 F.2d 9, 11 (2d Cir. 1992) (determining that an interior post office walkway was not a public forum). The United States Supreme Court has determined a postal sidewalk "was constructed solely to provide for the passage of individuals engaged in postal business" and therefore, not a public forum. *U.S. v. Kikinda*, 497 U.S. 720, 727 (1990).

Defendant has pointed to nothing, and nothing here suggests the post office was anything other than a nonpublic forum, the purpose of which was conducting postal business. *See Aunhkotep v. Eberhart*, No. 4:24-cv-01552-JMD, 2025 WL 3012995, at *3-4 (E.D. Missouri Oct. 25, 2025) (finding lobby area of the Assessor's Office was nonpublic forum when plaintiff recorded and requested agency records) (citing *Families Achieving Independence and Respect v. Neb. Dep't of Soc. Servs.*, 111 F.3d 1408, 1420-21 (8th Cir. 1997) (holding that the lobby of a County Office of the Nebraska Department of Public Services was a nonpublic forum). The purpose of the post office is certainly not to create a public square for free speech, but to enable access to the office for people to complete postal business. Just as the Supreme Court found it reasonable to restrict solicitation on a public sidewalk outside a post office because that sidewalk "was constructed solely to provide for the passage of individuals engaged in postal business," Defendant has failed to cite anything to suggest that the post office was constructed for any public expressive purpose, rather than for individuals to engage in postal business. *Kokinda*, 497 U.S. at 727. In fact, the very poster about which Defendant inquired when he entered the post office filming the employees makes it clear that activities like public address, public assembly, picketing, distributing literature, and demonstrating are prohibited in the interior areas of the post office open to the public, reinforcing the conclusion that the post office is a nonpublic forum.

Because we have determined the post office in this case is a nonpublic forum, we must determine whether the regulation by the government is reasonable and "not an effort to suppress expression merely because public officials oppose the speaker's view." *Perry*, 460 U.S. at 46. In our review, prohibiting Defendant from filming in the post office is reasonable and not some government effort to oppose Defendant's view. Defendant was being disruptive to other patrons of the post office, filming customers and employees without their permission, and interrupted business to the point that postal employees were unable to efficiently perform their jobs. Mr. Whitlow, the supervisor, and an unidentified postal patron all asked Defendant to stop filming. Defendant's actions were so disruptive to postal business that postal employees locked the door to the customer service area of the post office to continue business as usual. The restriction/regulation placed on Defendant was reasonable to allow the post office to continue to provide postal business to customers. Consequently, the disorderly conduct statute, as applied to Defendant in this particular case, does not run afoul of the First Amendment. Defendant is not entitled to relief on this issue.

*Special Jury Instruction*

Defendant argues that the trial court erred by refusing to give a jury instruction with examples of extremely offensive or provocative contact. Specifically, Defendant complains that even though the statute gives "some examples" of the type of conduct

- 14 -

prohibited, the trial court should have given a special jury instruction to include more examples like the ones given in *Smiley*, 38 S.W.3d at 525. The State disagrees, countering that the additional examples "do little to add clarity" and were for the most part "already covered by the trial court's instructions."

A defendant is entitled "to a correct and complete charge of the law, so that each issue of fact raised by the evidence will be submitted to the jury on proper instructions." *State v. Garrison*, 40 S.W.3d 426, 432 (Tenn. 2000). "Trial courts have the duty, without request, to give proper jury instructions as to the law governing the issues raised by the nature of the proceeding and the evidence introduced at trial." *State v. Hawkins*, 406 S.W.3d 121, 129 (Tenn. 2013). But jury instructions must be viewed in their entirety, and phrases may not be examined in isolation. *State v. Rimmer*, 250 S.W.3d 12, 31 (Tenn. 2008). "An instruction should be considered prejudicially erroneous only if the jury charge, when read as a whole, fails to fairly submit the legal issues or misleads the jury as to the applicable law." *State v. Majors*, 318 S.W.3d 850, 864-65 (Tenn. 2008) (quotation and citation omitted). A trial court need not give requested instructions if the substance of the instructions is covered in the general charge. *State v. Zirkle*, 910 S.W.2d 874, 892 (Tenn. Crim. App. 1995) (citing *State v. Blakely*, 677 S.W.2d 12 (Tenn. Crim. App. 1983)).

Generally, questions concerning the propriety of jury instructions are reviewed de novo with no presumption of correctness. *Smiley*, 38 S.W.3d at 524. However, a trial court's "refusal to grant a special instruction is error only when the general charge does not fully and fairly state the applicable law." *State v. Hawkins*, 406 S.W.3d 121 (Tenn. 2013).

Here, the trial court instructed the jury consistent with the Tennessee Pattern Jury Instructions. In explaining the elements of assault against a first responder to the jury, the trial court gave the examples of extremely offensive or provocative conduct as included in the statutory definition, "spitting, throwing, or otherwise transferring bodily fluid, pathogens, or human waste onto the person of a first responder." Defendant asked the trial court to add "kissing without one's consent, cutting one's hair without consent, and spitting in one's face." The trial court's instruction fully and fairly stated the applicable law and it was not error for the trial court to decline to give the special instruction. Defendant is not entitled to relief on this issue.

*Introduction of Poster Seven as Evidence*

Defendant argues that the trial court erred by admitting a copy of Poster Seven into evidence because it provided the jury with an alternative definition of disorderly conduct. Specifically, Defendant claims that the trial court invited "jury confusion," that the poster was irrelevant, and that the jury likely focused "on whether he's following the postal rule as opposed to the law." The State insists that the trial court did not abuse its discretion.

- 15 -

When a trial court makes an evidentiary ruling, the appropriate standard of review on direct appeal is "whether the record clearly demonstrates that the trial court abused its discretion[.]" *State v. McCaleb*, 582 S.W.3d 179, 186 (Tenn. 2019) (citing *Regions Bank v. Thomas*, 532 S.W.3d 330, 336 (Tenn. 2017); *State v. Davis*, 466 S.W.3d 49, 61 (Tenn. 2015)). In *McCaleb*, our supreme court explained:

> We emphasize that the abuse of discretion standard of review does not permit an appellate court to substitute its judgment for that of the trial court. *State v. Harbison*, 539 S.W.3d 149, 159 (Tenn. 2018). Rather, "[b]ecause, by their very nature, discretionary decisions involve a choice among acceptable alternatives, reviewing courts will not second-guess a trial court's exercise of its discretion simply because the trial court chose an alternative that the appellate courts would not have chosen." *White v. Vanderbilt Univ.*, 21 S.W.3d 215, 223 (Tenn. Ct. App. 1999). Accordingly, if the reviewing court determines that "reasonable minds can disagree with the propriety of the decision," the decision should be affirmed. *Harbison*, 539 S.W.3d at 159.

*Id.*

Tennessee Rule of Evidence 401 defines relevant evidence as evidence that has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. Relevant evidence is generally admissible. *See* Tenn. R. Evid. 402. However, even if evidence is relevant, it "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury[.]" Tenn. R. Evid. 403.

To recap, Defendant entered the post office and inquired about Poster Seven. Mr. Whitlow did not know what Defendant was talking about, but Defendant continued to inquire about Poster Seven. Mr. Whitlow explained that after Defendant left, he discovered what Poster Seven was and read it. The State moved to introduce Poster Seven into evidence. Defendant did not object. The trial court permitted Mr. Whitlow to read the following from Poster Seven:

> Disorderly conduct, or conduct that creates loud or unusual noise, or which impedes entrance to or departure from Post Offices or otherwise obstructs the usual use of entrances, foyers, corridors, offices, elevators, stairways, and parking lots, or which otherwise tends to impede or disturb the public or employees in the performance of their duties, or which impedes or disturbs

the general public in transacting business or obtaining the services provided on Postal Service property is prohibited.

Defendant does not acknowledge and the State does not argue that because Defendant failed to contemporaneously object to the introduction of Poster Seven, he is limited to plain error review on appeal. However, we have repeatedly reiterated that when a defendant fails to contemporaneously object to evidence at trial, this Court's review of the issue is limited to the discretionary plain error doctrine. *State v. Enix*, 653 S.W.3d 692, 700-01 (Tenn. 2022). Defendant has not asked this Court to exercise our discretion to undertake plain error review of this issue. As the appellant, Defendant bears the burden of establishing entitlement to plain error review. *See, e.g., Reynolds*, 635 S.W.3d at 931 (Tenn. 2021) (citation omitted). Because Defendant does not request plain error review, we decline to address this issue as plain error. *See State v. Nelson*, 275 S.W.3d 851, 864 (Tenn. Crim. App. 2008) ("Appellate courts are advised to use plain error sparingly in recognizing errors that have not been raised by the parties or have been waived due to a procedural default.") (citing *State v. Bledsoe*, 226 S.W.3d 349, 354 (Tenn. 2007)).

*Mistrial*

Defendant claims the trial court erred by denying his request for a mistrial after the State "attempted" to violate an earlier 404(b) ruling. Specifically, Defendant argues the trial court should have granted a mistrial after Mr. Whitlow's testimony that he saw Defendant at the post office a couple of weeks after the incident. The State counters that the trial court did not abuse its discretion when the jury was "ultimately prevented from hearing any evidence of a prior bad act."

Prior to trial, Defendant filed a motion to exclude other bad acts under Tennessee Rule of Evidence 404(b). At the hearing, the State informed the trial court that it was not aware of any 404(b) issues. The trial court granted the motion.

At trial, Mr. Whitlow was asked if he saw Defendant after the incident. Mr. Whitlow testified that Defendant returned to the post office. Counsel for Defendant objected before Mr. Whitlow could continue. The trial court sustained the objection, and the State abandoned the line of questioning. Counsel for Defendant asked for a mistrial. The trial court declined, commenting that "All he's said is that he's seen him after April 2. . . ." During a bench conference, counsel for the State indicated that Mr. Whitlow was going to testify that Defendant threatened him when he returned to the post office. Because the line of questioning was abandoned, the jury did not hear that testimony. Now, Defendant complains that the trial court erred by denying the mistrial.

- 17 -

A mistrial exists "to correct damage done to the judicial process when some event has occurred which precludes an impartial verdict." *State v. Welcome*, 280 S.W.3d 215, 222 (Tenn. Crim. App. 2007) (citing *State v. Williams*, 929 S.W.2d 385, 388 (Tenn. Crim. App. 1996)). "Normally, a mistrial should be declared only if there is a manifest necessity for such action." *State v. Saylor*, 117 S.W.3d 239, 250 (Tenn. 2003). Stated differently, "a mistrial is an appropriate remedy when a trial cannot continue, or a miscarriage of justice would result if it did." *State v. Land*, 34 S.W.3d 516, 527 (Tenn. Crim. App. 2000). The party seeking a mistrial bears the burden of establishing manifest necessity. *Id.* at 527. We review a trial court's decision to grant or deny a mistrial for abuse of discretion. *State v. Bell*, 512 S.W.3d 167, 187 (Tenn. 2015) (quoting *State v. Reid*, 91 S.W.3d 247, 279 (Tenn. 2002)). "A trial court abuses its discretion when it applies incorrect legal standards, reaches an illogical conclusion, bases its ruling on a clearly erroneous assessment of the proof, or applies reasoning that causes an injustice to the complaining party." *State v. Gevedon*, 671 S.W.3d 537, 543 (Tenn. 2023) (quoting *State v. Phelps*, 329 S.W.3d 436, 443 (Tenn. 2010)). Our supreme court has recognized three nonexclusive factors a reviewing court should consider when determining whether a trial court should have granted a mistrial because of inappropriate testimony before the jury: "(1) whether the State elicited the testimony, or whether it was unsolicited and unresponsive; (2) whether the trial court offered and gave a curative jury instruction; and (3) the relative strength or weakness of the State's proof." *Bell*, 512 S.W.3d at 188 (quoting *State v. Nash*, 294 S.W.3d 541, 547 (Tenn. 2009)).

Here, Defendant insists he is entitled to a mistrial because Mr. Whitlow testified that he returned to the post office after his arrest. Defendant claims that the testimony violated 404(b). There was no testimony entered into evidence about Defendant's prior bad acts. Defendant has not shown a manifest necessity for granting a mistrial. The trial court did not abuse its discretion, and Defendant is not entitled to relief on this issue.

*Admission of Testimony that Mr. Whitlow Viewed Defendant's Video Online*

Defendant argues that the trial court erred by allowing Mr. Whitlow to testify that he watched Defendant's video online. The State disagrees.

At trial, the following took place during Mr. Whitlow's testimony:

Q: What format did you watch the video in?
A: What do you mean like internet format?
Q: That's right?
A: YouTube unfortunately.
Q: Did you post that to YouTube?
A: No, I kept myself off the internet.

- 18 -

After this testimony, counsel for Defendant objected to the relevance. The State responded that the evidence went "to the elements of count number three." When questioning continued, Mr. Whitlow was asked again where he saw the video. He replied, "YouTube." He denied uploading the video to YouTube and was again asked if he gave anyone permission to upload the video. Counsel for Defendant objected a second time, for relevance, and the trial court allowed Mr. Whitlow to answer the question. Mr. Whitlow responded, "No, I've kept myself off of the internet. I have no social media."

As stated previously, relevant evidence is evidence that has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. Relevant evidence is generally admissible. *See* Tenn. R. Evid. 402. However, even if evidence is relevant, it "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury[.]" Tenn. R. Evid. 403.

Defendant argues that the fact that he posted the video on the internet is not relevant and was prejudicial. The State argues that the evidence was relevant to show Defendant had the intent to cause public annoyance or alarm.

We find it important to note that Mr. Whitlow did not testify or insinuate that Defendant posted the video on YouTube. Mr. Whitlow testified that he watched it on YouTube, did not post it there himself, and did not give anyone permission to post it there. Moreover, the video itself was entered into evidence and Defendant did not object to the introduction of the video. In our view, the testimony was relevant, and the trial court did not abuse its discretion in allowing the testimony. Defendant is not entitled to relief on this issue.

### *Cumulative Error*

Because we have found no error, we decline to address Defendant's argument that the trial was so replete with error that he is entitled to a new trial.

### *Conclusion*

For the foregoing reasons, the judgments of the trial court are affirmed.

*S/Timothy L. Easter*
TIMOTHY L. EASTER, JUDGE

- 19 -